**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| COSMED GROUP, INC.,<br>Plaintiff | |
| v. | C.A. No. 03-322-ML |
| CHURCHILL MEDICAL SYSTEMS, INC.,<br>Defendant | |

**DEFENDANT CHURCHILL MEDICAL SYSTEMS, INC.'S**
**MOTION TO CONFIRM ARBITRATION AWARD**

Now comes Defendant Churchill Medical Systems, Inc. ("Churchill") and pursuant to R.I.G.L § 10-3-11 applies to this Honorable Court for an Order confirming the arbitration award in the above-referenced matter in favor of Churchill. In support of its motion Churchill relies upon the accompanying Memorandum of Law.

WHEREFORE Churchill Medical Systems, Inc. respectfully requests that judgment enter in its favor and against Cosmed Group, Inc. pursuant to the Award of Arbitrator.

CHURCHILL MEDICAL SYSTEMS, INC.

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

Steven E. Snow (#1774)
Lisa M. Martinelli (#6350)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX

DATED: March 30, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing DEFENDANT CHURCHILL MEDICAL SYSTEMS, INC.'S MOTION TO CONFIRM ARBITRATION AWARD was mailed, postage prepaid, on this 30th day of March 2006 to:

Armando E. Batastini, Esq.
Edwards Angell Palmer & Dodge, LLI
2800 Financial Plaza
Providence, RI 02903

848222_1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

COSMED GROUP, INC.,
Plaintiff

v.

CHURCHILL MEDICAL SYSTEMS, INC.,
Defendant

C.A. No. 03-322-ML

**DEFENDANT CHURCHILL MEDICAL SYSTEMS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO CONFIRM ARBITRATION AWARD**

Now comes Defendant Churchill Medical Systems, Inc. ("Churchill") and pursuant to R.I.G.L §10-3-11 applies to this Honorable Court for an Order confirming the arbitration award in the above-referenced matter in favor of Churchill. A true and correct copy of the Award of the Arbitrator is attached hereto as Exhibit 1.

The facts in support of Churchill's Motion are as follows:

On or about August 14, 2003, Cosmed Group, Inc. ("Cosmed") filed its Complaint against Churchill for an alleged breach of an ethylene oxide sterilization agreement (the "Agreement"). A true and correct copy of the Agreement is attached hereto at Exhibit 2. The Agreement contains an arbitration clause at page 8, paragraph 28. After hearing on Cosmed's Motion for Summary Judgment, this Court entered an Order on May 25, 2005 finding the arbitration clause contained in the Agreement enforceable and stayed this action pending completion of the arbitration.

Attorney Frederick Connelly Jr. was appointed as Arbitrator on or about August 15, 2005. A true and correct copy of the Notice of Appointment is attached hereto as Exhibit 3. The arbitration was held on January 23, 2006 through January 25, 2006. After completion of the

arbitration, Arbitrator Connelly rendered an award in favor of Churchill and ordered that Cosmed take nothing.

A proposed order of Judgment is being submitted contemporaneously with this Motion.

WHEREFORE Churchill Medical Systems, Inc. respectfully requests that judgment enter in its favor and against Cosmed Group, Inc. pursuant to the Award of Arbitrator.

CHURCHILL MEDICAL SYSTEMS, INC.

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

Steven E. Snow (#1774)
Lisa M. Martinelli (#6350)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX

DATED: March 30, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing DEFENDANT CHURCHILL MEDICAL SYSTEMS, INC.'S MOTION TO CONFIRM ARBITRATION AWARD was mailed, postage prepaid, on this 30th day of March 2006 to:

Armando E. Batastini, Esq.
Edwards Angell Palmer & Dodge, LLP
2800 Financial Plaza
Providence, RI 02903

848614_1

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 11 199 01280 05
Cosmed Group, Inc. ("Cosmed")
and
Churchill Medical Systems, Inc. ("Churchill")

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated October 1, 1998, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, FIND and AWARD, as follows:

A demand for Arbitration was filed by Cosmed Group, Inc. ("Cosmed") on or about June 6, 2005. Attached to the demand was a written agreement entitled "Ethylene Oxide Processing Agreement," dated October 1, 1998 ("Agreement"). That contract calls for arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association.[1]

The matter came on for arbitration before the undersigned arbitrator who heard the evidence presented by the parties during three (3) days of hearing on January 23, 24 and 25 at Peabody & Arnold, 40 Westminster Street, Providence, Rhode Island 02903. Cosmed was represented by Armando Batastini, Esq., Edwards & Angell, 2800 Financial Plaza, Providence,

[1] Cosmed initially filed a breach of contract action in the United States District Court, District of Rhode Island. The parties conducted discovery under that action, including depositions, and did not need to conduct discovery under the more limiting Rules of the AAA. After the District Court determined the Arbitration provision contained in the contract was binding, a demand for arbitration was filed.

Rhode Island. Churchill was represented by Attorneys Steven Snow and Lisa Martinelli of Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, Rhode Island.

The following witnesses were sworn and appeared:

For Cosmed: David Howe[2]

For Churchill: Veronica Haug, Vice President of Operations, Churchill Medical
John T. Sasso, President of Churchill Medical

In addition to a large number of documents submitted at the arbitration as joint exhibits, the arbitrator was also provided with the deposition transcript of former Cosmed Quality Assurance Manager Robert Bilodeau and the deposition transcripts of John Sasso and David Howe.

The attorneys made opening statements, offered testimony and exhibits and made closing arguments. The parties were then asked to submit post-hearing briefs which were received by the arbitrator on February 27, 2006. The hearing was declared closed on that date.

In rendering an award, the arbitrator is bound to follow the AAA Commercial Arbitration Rules unless varied by the parties in their written agreement. With the exception of the method of choosing an arbitrator, which the parties jointly decided to ignore, the arbitration provision in the agreement does not alter the AAA rules.

Before discussing the decision, the arbitrator first wishes to state that both parties were well represented. The attorneys were prepared, thorough and zealous, while at all times acting in a professional manner.

[2] Former employee Doug Parzuchowski was also on Cosmed's witness list but did not testify.

DECISION

As presented, there are two major issues in the case:

1. Whether Robert Bilodeau had the authority to bind Churchill to the October 1, 1998 Agreement; and

2. Whether the Agreement is enforceable or whether the doctrine of waiver estoppel or other contract principals prevent Cosmed from now enforcing the exclusivity and minimum production provisions in the Agreement.

AUTHORITY

After considering all the evidence, the arbitrator concludes that Robert Bilodeau had the authority to bind Churchill to the October 1, 1998 Agreement. The President and Vice President of Churchill had given Mr. Bilodeau the authority to negotiate and sign sterilization agreements in the past. The prior agreements and the subject Agreement contained no language limiting Mr. Bilodeau's power to negotiate and bind Churchill. Under Rhode Island law, Churchill is bound by the Agreement if its employee had actual authority, either express or implied, to act on behalf of the employer. Churchill placed Bilodeau in the position of being its representative with respect to negotiating the subject contract and prior contracts. Not only did the Churchill principals fail to communicate any limitation on Bilodeau's agency, the evidence was that Cosmed was not aware that someone other than Bilodeau needed to sign off on the contracts.

Without belaboring the point, at the very minimum Bilodeau had apparent authority. As set forth in Cosmed's brief, under Rhode Island law, apparent authority exists as long as the third party to whom the principal has made the manifestation of authority, continues to reasonably believe that the agent is authorized. See Schack v. U.S., 56 F. Supp. 2d. 185, 193, 194 (D.R.J.

1999). Bilodeau testified that he had the authority to bind Churchill. Certainly Cosmed was reasonable in believing the same.

Although of minimal relevance given the decision regarding authority, Churchill's repeated argument that the principals would never have agreed to an Agreement containing exclusivity language is not supported by the evidence. For various periods of time, Churchill has relied exclusively on one sterilizer. In her note of August 24, 1998 (Exhibit 23) Veronica Haug wrote "will keep both sterilizers for now." (emphasis added) The exclusivity provision would not have prevented the manufacturer from turning to a back up source in the event of an emergency. Both parties agree that an emergency back up was anticipated.

THE CONTRACT

After it was signed, both parties acted as if the subject Agreement never existed[3]. The Agreement is for the processing of thirteen (13) pallet loads. Much of the negotiations leading up to the signed Agreement dealt with the processing of 13 pallet loads in Cosmed's reconfigured chamber. Cosmed wanted Churchill's business and at Churchill's request was willing to go through the time and expense of reconfiguring its chamber. Attachment A to the Agreement states: "sterilizer size: Thirteen (13) pallet (40" x 48" x 80")." The "charges per run" as set forth in Attachment A is not set forth as a price per pallet but as a price for a thirteen (13) pallet load.

At the time the subject Agreement was signed, Cosmed was processing Churchill's product pursuant to a contract dated April 1, 1996 which was entered into on January 3, 1997

[3] There are numerous examples of the Agreement being ignored. Cosmed offered to pay for the validation of the chamber while the Agreement called for Churchill to pay. Three arbitrators were to decide any dispute, instead the parties decided to employ one arbitrator.

(Exhibit 11). That was a twelve (12) month agreement but contained an automatic renewal provision. That agreement, per its Attachment B, concerned Cosmed's nine (9) pallet sterilizer and the contracted price was for a nine (9) pallet load.

Based upon these two contracts, it would appear that nine (9) pallet loads would be processed pursuant to the 1996 agreement while thirteen (13) pallet loads would be processed per the subject Agreement.

There is no mention of the processing of a nine (9) pallet load in the subject Agreement or what price should be charged for a nine (9) pallet load. There was testimony that the price arrived at was evidenced in the September 30, 1998 letter from Robert Bilodeau to Clark Houghting (Exhibit 25). This would run afoul of Paragraph 18 of the subject Agreement which reads in part: "Further, this Agreement and any Exhibit(s) and Attachment(s) are the complete and exclusive statement of the agreement between the parties, superseding all proposals or prior agreements, oral or written, and all other communications between the parties relating to the subject matter of the Agreement."

It is unclear whether pursuant to this provision the subject Agreement supersedes the 1996 agreement or whether that agreement involved a "different subject matter": (nine (9) pallet sterilizer chamber and nine (9) pallet loads versus thirteen (13) pallet sterilizer and thirteen (13) pallet loads).

It is necessary to look outside the four corners of the subject Agreement to learn that the parties were in discussions related to Cosmed's conversion of a sterilizer from a nine (9) pallet size to a larger size to handle thirteen (13) pallets. Apparently, these discussions began after a meeting at Churchill's New Hampshire facility in April 1998. There was uncontroverted evidence that Churchill had a single truck which could carry thirteen (13) pallet loads and that it

was more cost effective for them to ship thirteen (13) pallets at a time to Cosmed. These discussions resulted in the thirteen (13) pallet subject Agreement.

David Howe of Cosmed testified that the chamber conversion was completed prior to the signing of the subject Agreement. Cosmed argues that pursuant to the Agreement, it was Churchill's responsibility to validate the chamber and that Churchill's failure to complete the validation is the reason Churchill's product was not sterilized in the thirteen (13) pallet chamber. This ignores the fact that in order to validate a chamber owned by Cosmed the parties would need to work together.

There was a substantial void of information concerning this issue. The persons who testified had little information as to why validation was not completed. What was clear from the evidence is that there was little written communication between the parties about the validation. Churchill continued to ship nine (9) pallet loads and Cosmed continued to process them as if the thirteen (13) pallet agreement did not exist.

There was evidence that Cosmed had another customer using the new thirteen (13) pallet chamber starting in 1998 or 1999, while Churchill continued to occupy the nine (9) pallet chamber. There is no evidence that Cosmed complained on a single occasion to Churchill concerning Churchill's alleged failure to validate the new chamber. Presumably, if the validation procedure went forward, the chamber would not have been available to this other customer for the time it took to complete the validation. It is clear from the evidence that Cosmed was content with allowing Churchill to process in the smaller chamber while using the converted chamber for another customer. Cosmed cannot years later claim that Churchill breached the contract after Cosmed chose to ignore it.

QUANTITY OF DEVICES

Under Paragraph 2 of the subject Agreement, Churchill was to use Cosmed exclusively for all its ethylene oxide processing. In addition, Churchill agreed to process "an average of approximately three (3), thirteen (13) pallet loads of devices per week." If Churchill fails to meet this minimum, it will pay a penalty. This provision is at the heart of Cosmed's claim that Churchill breached the subject Agreement and forms the basis for its damages calculations.

I will first discus the enforceability of the minimum processing requirement. Most of the prior agreements between the parties contained similar language. In each instance, Churchill failed to meet the minimum and in each instance Cosmed took no action. There is no evidence that Cosmed ever claimed a breach of a minimum provision until the underlying lawsuit was filed.

Cosmed argues that the minimum requirement in the subject agreement must be viewed and treated differently because it contains a damages provision not found in the prior agreement. That provision is as follows:

> "In the event Manufacturer does not purchase this quantity of processing services during the applicable period, Manufacture shall pay Cosmed within thirty (30) days of the end of the Initial Period or any applicable Extension Period as set forth in Section 22 hereof, an amount equal to one half multiple times the difference between (i) the total price of the processing services that Manufacturer was obligated to purchase during the applicable period and (ii) the actual price of the processing services that Manufacturer purchased during the applicable period."

The evidence showed that during the period the Agreement was in effect most weeks Churchill failed to process thirty-nine (39) pallet loads at Cosmed. Not once did Cosmed write to Churchill and reference this provision in the contract. Cosmed continued to do business with Churchill despite the alleged breaches, effectively waiving those provisions of the contract.

Cosmed sent Churchill an invoice following the processing of each load. Cosmed never included on any invoice a bill for failure to process the minimum, nor was any deficiency ever referenced.

As written, the minimum provision would be difficult to enforce and certainly difficult to determine damages. Cosmed was to process, an average of approximately three (3), thirteen (13) pallet loads.... (emphasis added) This language is nonprecise at best. While an argument can be made that "average" refers to an average over the term of the Agreement, this creates an accounting nightmare even if the Agreement were to end at the end of the initial three (3) year period. At the very least, Churchill should have been kept informed of the amount they were in arrears. More troubling is the "approximately" language. The vague term makes it impossible to determine by how much Churchill failed to meet the minimum. Further, because the number for compliance with the minimum was only an approximation, it was all the more important that Cosmed notify Churchill that it was of the opinion the number was not being met. Otherwise, Churchill may have concluded all along that it was "approximately" meeting the minimum. It would appear that no more thought went into the drafting of the minimum provision in the subject Agreement as it did in the prior Agreements.

During the years leading up to the lawsuit, Cosmed appeared to have waived the minimum requirement as they had under the prior agreements. Cosmed argues that they did not need to send a bill for the delinquency until after the contract came to an end. As unwieldy as this is, it does not mean that Cosmed had the right to keep Churchill in the dark over those years concerning their intentions.

On the subject of intentions, there is no evidence that Cosmed had any intention of billing Churchill for the delinquency and only decided to do so when the relationship ended.

Apparently, Cosmed did not keep track of how far behind the required average number of loads Churchill had fallen. Cosmed needed to rely upon Churchill's records to calculate its alleged damages, despite the requirement under Paragraph 3 that each party shall maintain records of the number of devices sent by Manufacturer to Cosmed.

It would be unfair to Churchill to require payment for the failure to meet the average minimum when they would have had no idea they were being charged for it. Cosmed never sent a breakdown of the delinquencies monthly, yearly or at any other time. This would be the arbitrator's decision even if the main purpose of the Agreement (the processing of thirteen (13) pallet loads) wasn't completely ignored by the parties.

EXCLUSIVITY

Cosmed acknowledges that it was aware that Churchill failed to meet the minimum requirements under the Agreement but that it did not know until the end that Churchill was breaching its duty to process exclusively at Cosmed. In addition, Cosmed argues it could not calculate its damages for this breach until it received Churchill's records showing how many pallets it processed elsewhere during the contract term.

There was evidence that Cosmed was put on notice several times that Churchill was continuing to process at other facilities. (See Exhibits 30, 33) At no time did Cosmed take the position that by doing so Churchill was breaching the contract.

Robert Bilodeau testified that he had discussions with Mr. Parzuchowski and Mr. Houghting of Cosmed about the fact that Churchill was continuing to process at Isomedix. He testified "because it's the only other game in town. They knew where our stuff was being processed. We were open about it." (Exhibit 44) This testimony was uncontroverted.

Although not conclusive, it is helpful to point out that Cosmed argued it was serious about the minimum requirement this time and that is why a damages provision was added. The Agreement does not contain a damages provision related to any failure to process exclusively at Cosmed.

The subject Agreement dealt with the processing of thirteen (13) pallet loads only. Cosmed fails to provide evidence why it never required Churchill to validate in the reconfigured chamber. Mr. Howe testified that he was unaware of any written document evidencing Cosmed's belief that Churchill was at fault for delaying validation. He never was involved in any discussions regarding validation. Without validation, Churchill could not use the chamber and thus the exclusivity as envisioned in the thirteen (13) pallet Agreement was impossible to obtain. Not only did Cosmed not complain about Churchill's responsibility or even shared responsibility to validate, there is also no evidence that Cosmed notified Churchill that it's thirteen (13) pallet chamber was underutilized. Although, the evidence on this subject is minimal, it would also appear that once it validated the larger chamber for another customer, Cosmed could not have handled all of Churchill's volume in that chamber.

In May 2000, Cosmed proposed validating Churchill in its twenty-four (24) pallet sterilizer for thirteen (13) pallet loads. This is significant for several reasons. At no time during these negotiations does Cosmed reference the subject Agreement, the minimum requirement, exclusivity or Churchill's alleged failure to validate the first chamber. Further, working with Cosmed Churchill promptly approved the validation protocol. Presumably, Churchill would have done so with the reconfigured chamber if that had been made available. Finally, there were price increases discussed again without reference to the subject Agreement.

Even when the larger chamber was validated for Churchill there again was no urgency by either party to process Churchill's thirteen (13) pallet loads. The exhibit listing the number and location of pallets processed which was produced by Churchill (Exhibit 39) shows that the first thirteen (13) pallet load processed by Cosmed for Churchill was March 14, 2001.[4] Even when this chamber was made available to Churchill, it was used infrequently. Again, Cosmed never complained or cited the provisions of the subject Agreement.

In a letter dated October 3, 2001 from Cosmed to Churchill (Exhibit 38), reference is made to the October 1, 1998 agreement. Therefore, it was not until after the initial three year term expired that we see any reference to the subject Agreement. The letter discussed a price adjustment and a need to adjust the price. There is no reference to Churchill's obvious failure to meet its minimums under the contract or its flaunting of the exclusivity provision. As seen in Exhibit 39, in the six months prior to this letter, Churchill was sending most of its pallets to Isomedix and processing an average of 15.2 pallets per week at Cosmed. Churchill did not meet the minimum once in those 26 weeks and on 6 weeks sent not a single pallet. Despite this, Cosmed's Vice President concludes his letter by stating: "We look forward to continuing the excellent business relationship between our organizations, and to ensuring that it remains mutually beneficial."

Assuming, as Mr. Howe argued, he was fully aware of the terms of the subject Agreement, it is clear from the evidence presented that Cosmed waived the minimum and

[4] There was a thirteen (13) pallet load listed at Cosmed on May 14, 2000 (Exhibit 39). Given the price and the placement on the list, this appears to be a typo.

exclusivity provisions and the related damages provision. Cosmed's conduct (as well as Churchill's) was in all material ways inconsistent with the terms of the contract.

CONCLUSION

For the foresaid reasons, the arbitrator finds for the respondent and orders that the Cosmed shall take nothing.

The administrative fees of the American Arbitration Association totaling $6,000.00, and the compensation of the arbitrator totaling $10,032.00 shall be borne equally. Therefore, Churchill shall reimburse Cosmed the sum of $3,000.00 representing that portion of said fees in excess of the apportioned costs previously incurred by Cosmed.

The arbitrator makes no decision concerning costs and/or fees relating to the underlying civil matter filed at the U.S. District Court, District of Rhode Island.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

3/24/06
Date

Mr. Frederick Connelly Jr.

I, Mr. Frederick Connelly Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

3/24/06
Date

Mr. Frederick Connelly Jr.

# ETHYLENE OXIDE PROCESSING AGREEMENT

This Agreement entered into in Coventry, Rhode Island is made as of the first day of October, 1998, by and between COSMED GROUP, INC., a Maryland corporation, having an office at 8 Industrial Drive, Coventry, Rhode Island 02816 (hereinafter called "Cosmed"), and CHURCHILL MEDICAL SYSTEMS, INC., a New Hampshire corporation, having an office at 87 Venture Drive, Dover, New Hampshire 03820 (hereinafter called "Manufacturer") (individually a "Party", and collectively referred to as the "Parties").

In consideration of the mutual covenants contained herein, the Parties agree as follows:

1. Processing. Manufacturer desires to ship certain devices, which may be marked "sterile," but may actually be non-sterile, to Cosmed for processing with ethylene oxide. As required by 21 C.F.R. §801.150(e)(1) and (2), Manufacturer must label each pallet, carton or other designated shipping unit of devices, "Non-Sterile, Awaiting Further Processing" (or equivalent). Cosmed shall process the devices in accordance with Manufacturer's written specifications set forth in EXHIBIT A (the "Specifications"). The devices that are subject to this Agreement are various single use disposable medical products (i.e. Extension Sets, Infusion Sets, Laparoscopic Devices, and Custom Kits) (the "Devices"). Processing services will be provided solely in accordance with the Specifications and do not include the removal of "manufacturing material," or the purification or processing of any entity or impurity that does not respond to ethylene oxide.

2. Quantity of Devices. Manufacturer shall use Cosmed exclusively for all of its ethylene oxide processing. Manufacturer shall send for processing, and Cosmed shall process, an average of approximately three (3), thirteen (13) pallet loads of Devices per week during the applicable period to be processed in accordance with the terms and conditions of this Agreement. In the event Manufacturer does not purchase this quantity of processing services during the applicable period, Manufacturer shall pay Cosmed within thirty (30) days of the end of the Initial Period or any applicable Extension Period as set forth in Section 22 hereof, an amount equal to one half multiple times the difference between (i) the total price of the processing services that Manufacturer was obligated to purchase during the applicable period and (ii) the actual price of the processing services that Manufacturer purchased during the applicable period.

3. Record Keeping. The Parties shall each maintain records of the number of Devices sent by Manufacturer to Cosmed for processing.

4. Adjustments. Manufacturer may modify the Specifications by delivering written notice of the modifications to Cosmed. Cosmed will use all commercially reasonable efforts to implement such changes to the Specifications as soon as practicable. If the modifications cause Cosmed to use additional materials or time, the Parties shall adjust the price as specified in Section 12. If the schedule of pricing contained in ATTACHMENT A does not address the change made, the price shall be adjusted to reflect the added cost. Any dispute as to the price adjustment shall be settled by arbitration as provided for in Section 28. However, Manufacturer shall pay the adjusted price as determined by Cosmed pending the arbitrator's decision.

5. Regulatory Requirements. The Parties acknowledge that the terms and conditions of this Agreement are subject in all respects to the regulatory requirements imposed by the United States Food and Drug Administration ("FDA"). This Agreement, when the Devices are medical devices, is meant to satisfy the requirements of 21 C.F.R. §801.150(e), as well as the requirements specified in other FDA regulations and guidelines. The Parties agree to abide by those regulatory requirements.

6. Manufacturer's Responsibilities. In addition to its other responsibilities under this Agreement, Manufacturer is responsible for: (a) ensuring that the process and the Specifications are appropriate for the Devices, (b) ensuring that the Specifications comply with all appropriate FDA requirements for processing of the Devices, and (c) validating the process. This includes ensuring post-processing product functionality and packaging integrity. Manufacturer also shall be responsible for maintaining all reports required by the FDA, including the Device Master Record and the Device History Records. Manufacturer shall also be responsible for obtaining any regulatory clearances that are required before the Devices may be introduced into interstate commerce, including, but not limited to, filing any necessary premarket notifications, premarket approval applications, and premarket approval supplements.

7. Equipment. Manufacturer has viewed the equipment Cosmed will use in the process and has satisfied itself that the equipment is suitable for processing the Devices according to the Specifications.

8. Reprocessing. The Parties agree to advise each other, as soon as possible, by written notice of (a) any failure of the process to conform to the Specifications; (b) any changes which could adversely affect the processing of the Devices; and (c) any test results obtained by the Manufacturer which establish that Devices fail to meet testing criteria.

9. Shipping and Handling. Manufacturer has responsibility for properly labeling the Devices prior to processing as required by 21 C.F.R. §801.150(e)(2). Following processing and until such time as Manufacturer's testing establishes that the Devices are acceptable, each pallet, carton or other designated unit of the Devices shall: (1) be quarantined; (2) be conspicuously marked "Processed-Awaiting Test Results" or equivalent; and (3) not be shipped to anyone but the Manufacturer or its agents. Upon written request to Cosmed, Manufacturer will arrange for shipment of Devices under quarantine to either Manufacturer or to such agent of Manufacturer as Manufacturer shall designate in writing. Only Manufacturer or its designated agent may remove the quarantine status. Cosmed is responsible for handling and treatment of Devices only to the extent that such Devices are physically located within the processing facility utilized by Cosmed. All expenses of shipping are the exclusive responsibility of Manufacturer.

10. Testing. Manufacturer may elect to instruct Cosmed on the placement, processing, recovery and handling of any biological, chemical or physical test samples as well as on the procedures for the chain of custody, packaging and shipment of the test samples. Testing shall be the obligation and responsibility of the Manufacturer.

11. Audits. Cosmed agrees to allow Manufacturer to have access to its facilities upon reasonable notice during business hours for the purpose of conducting Quality System regulation ("QSR") audits. Any information learned by Manufacturer in the course of an audit shall be treated as Confidential Information as herein after defined.

12. Price. Manufacturer shall pay Cosmed at the rate set forth in the pricing schedule contained in Attachment A. Cosmed will hold the prices stated herein for the first year of the Agreement. Subsequent price increases, if any, will not occur any more often than annually. Cosmed shall provide written notice to Manufacturer of any such price changes thirty (30) days prior to such change. All price adjustments shall be deemed to be included on ATTACHMENT A. Specifically, and without limiting the generality of the foregoing, the price shall be adjusted by the amount of any increase in the Consumer Price Index (CPI) as published by the federal government, and the prices of raw materials, energy, and/or labor used in the process. Cosmed shall invoice Manufacturer upon completion of the processing of the Devices, and Manufacturer shall pay the amount due within ten (10) days of invoicing. For any balance not paid within ten (10) days of the billing date, interest will be charged at the rate of 1.5% per month (annual interest rate of 18%). Should the account be placed in the hands of an attorney for collection, Manufacturer agrees to pay all costs of collection, including reasonable attorneys fees and expenses.

13. Insurance. Cosmed shall maintain commercial, general and hazard liability insurance for its benefit and the benefit of Manufacturer of not less than One Million Dollars ($1,000,000.00). Cosmed does not and shall not maintain product liability insurance. However, Cosmed shall maintain general liability insurance on the Devices while the Devices are at Cosmed's facility for damages to the Devices caused by Cosmed, fire, or theft. Manufacturer shall maintain commercial, general and hazard liability and product liability insurance for its benefit and the benefit of Cosmed of not less than One Million Dollars ($1,000,000.00). Cosmed shall be named as an additional insured on Manufacturer's policies. At Cosmed's request, Manufacturer shall furnish to Cosmed a copy of all insurance policies or certificates of insurance evidencing the insurance policies required to be procured by Manufacturer under the Agreement. The Parties agree to have all insurance policies carried by either of them to be endorsed with a clause providing that any release from liability or waiver of claim for recovery from the other Party entered into in writing by the insured thereunder prior to any loss or damage shall preclude the insured from recovering thereunder, and providing further that the insurer waives all rights of subrogation which such insurer might have against the other Party. Notwithstanding anything to the contrary set forth herein, any release or any waiver of claims shall not be operative, where the effect of such release or waiver is to invalidate insurance coverage or invalidate the right of the insured to recover thereunder.

14. Title. Title to all Devices and the risk of loss or damage remains with Manufacturer at all times.

15. Liability. (a) THE PARTIES AGREE THAT COSMED'S OBLIGATIONS UNDER THIS AGREEMENT ARE LIMITED TO PROCESSING THE DEVICES IN ACCORDANCE WITH THE SPECIFICATIONS. THE MANUFACTURER ACKNOWLEDGES THAT MANY FACTORS BEYOND COSMED'S CONTROL CAN AFFECT THE ULTIMATE MICROBIOLOGICAL CONDITION OF THE DEVICES. THE MANUFACTURER ACKNOWLEDGES AND AGREES THAT THE MANUFACTURER IS SOLELY AND

EXCLUSIVELY RESPONSIBLE FOR THE VALIDATION OF THE PROCESSING, PRODUCT STERILITY ASSURANCE, PRODUCT FUNCTIONALITY, PACKAGING INTEGRITY, AND THE ADEQUACY OF PRODUCT LABELING. COSMED MAKES NO REPRESENTATION, GUARANTY OR WARRANTY, EXPRESSED OR IMPLIED, WITH RESPECT TO THE STERILITY OF THE PRODUCTS WHICH ARE PROCESSED HEREUNDER.

(b) THE PARTIES AGREE THAT THE MANUFACTURER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF COSMED'S FAILURE TO PROCESS THE DEVICES IN ACCORDANCE WITH THE SPECIFICATIONS SHALL BE LIMITED TO THE COST OF REPROCESSING THE DEVICES AND THE DIRECT MANUFACTURING COST OF REPLACING DAMAGED DEVICES. IN NO EVENT SHALL COSMED BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO DAMAGES ARISING FROM DEATH, BODILY INJURY, PROPERTY DAMAGE OTHER THAN DAMAGE TO THE DEVICES, LOSS OF PROFITS OR REVENUE OR LOSS OF USE OF THE DEVICES.

16. <u>Indemnification</u>. The Manufacturer agrees to indemnify and save Cosmed harmless from and against all expenses, losses, costs, deficiencies, liabilities and damages, including reasonable attorneys' fees and expenses (collectively, "damages") incurred or suffered by Cosmed arising out of or in connection with (i) any breach by the Manufacturer of any of its covenants or agreement made in this Agreement, (ii) the processing of the Devices, except to the extent such damages arise out of negligent acts or omissions of Cosmed in failing to comply with the provisions of the Agreement, (iii) any claim that the Devices are not sterile, or (iv) any claim relating to any injuries suffered by Manufacturer, its employees and agents while on Cosmed's premises.

17. <u>Warranties</u>. COSMED WARRANTS THAT ITS PERFORMANCE OF THE PROCESS WILL CONFORM TO THE SPECIFICATIONS. MANUFACTURER SHALL INSPECT THE DEVICES PROMPTLY UPON RECEIPT AND ANY AND ALL CLAIMS BY MANUFACTURER UNDER THIS WARRANTY SHALL BE BROUGHT WITHIN TEN (10) DAYS AFTER MANUFACTURER OR ITS AGENTS RECEIVE THE DEVICES FROM COSMED. THIS EXPRESS WARRANTY REPLACES AND IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR APPLICATION OR USE. COSMED AND MANUFACTURER SHALL ATTEMPT TO RESOLVE THE MATTER IN GOOD FAITH FOR A PERIOD OF AT LEAST NINETY (90) DAYS. IN THE EVENT THE CLAIM CANNOT BE RESOLVED BETWEEN MANUFACTURER AND COSMED, THE DISPUTE SHALL BE RESOLVED BY AN ARBITRATION AS SET FORTH IN SECTION 28 HEREOF.

18. <u>Entire Agreement</u>. The Parties acknowledge that they have read this Agreement, understand it, and agree to be bound by its terms and conditions. Further, this Agreement and any Exhibit(s) and Attachment(s) are the complete and exclusive statement of the agreement between the Parties, superseding all proposals or prior agreements, oral or written, and all other communications between the Parties relating to the subject matter of this Agreement. This Agreement may not be modified or amended except by a subsequent writing signed by both Parties.

19. Assignment. Manufacturer shall not assign this Agreement without the prior written consent of Cosmed.

20. Force Majeure. Neither Cosmed nor Manufacturer shall be liable or deemed in default for failure to perform or delay in performance due to any reason beyond its control (a "force majeure"), including, but not limited to, acts of God, acts of nature, acts of governments, fire, flood, accidents, strikes or other interruptions of labor, shortages or scarcity of material, electricity, labor or fuel, mechanical breakdowns, or inability to obtain transportation, provided each Party shall give the other timely notice of inability to perform or deliver. In no event shall a declaration of force majeure by Cosmed relieve Manufacturer of its obligation to pay any invoice issued for Devices processed by Cosmed and not rejected by Manufacturer under this Agreement.

21. Confidentiality.

(a) Cosmed acknowledges that, in the course of performing its obligations pursuant to this Agreement, it may obtain certain confidential and/or proprietary information belonging to Manufacturer. Subject to the exceptions set forth hereinafter, Cosmed agrees that all information communicated to it by Manufacturer shall be received in strict confidence, shall be used only for the purposes of this Agreement and shall not be disclosed by it, its agents or employees without the prior written consent of Manufacturer, except as may be necessary by reason of legal or regulatory requirements beyond Cosmed's reasonable control. This obligation of confidentiality shall survive the termination of this Agreement, but shall not apply to information which is (i) publicly known or becomes publicly known through no act of Cosmed; (ii) rightfully received from a third Party; (iii) independently developed; or (iv) already known to Cosmed.

(b) Manufacturer acknowledges and agrees that certain information it has acquired or will acquire from Cosmed or others prior to or during the Initial Period or the Extension Period with respect to Cosmed's processes and methods of sterilization, trade secrets and proprietary information (collectively, the "Confidential Information") are of a confidential and secret character and of immeasurable value to Cosmed. Manufacturer agrees that it will not, at any time during or after the Initial Period or the Extension Period, use for itself (except on behalf of Cosmed) or others or disclose or communicate to any person, firm, corporation, association, or other entity, for any reason or purpose whatsoever, any information concerning such Confidential Information.

(c) Manufacturer acknowledges and agrees that the information relating to the Confidential Information is proprietary and constitutes a trade secret(s) of Cosmed. Manufacturer agrees that it will not disclose any information relating to the Confidential Information, directly or indirectly, or use such information in any way, either during the Initial Period or the Extension Period or any time thereafter, except as may be required by Cosmed. Manufacturer shall not remove from any Cosmed facility or disclose to any person, firm, corporation, association, or other entity, any files, records, documents, drawings, specifications, equipment or similar items relating to the Confidential Information, regardless of whether prepared by Manufacturer, except as may be required by Cosmed in the course of the Initial Period or the Extension Period, without the prior written consent of Cosmed.

(d) Notwithstanding the foregoing, Manufacturer's undertakings and obligations under this Section 21 shall not apply to any information concerning Confidential Information which:

(i) is approved for release by written authorization of Cosmed; or

(ii) is required by law to be disclosed, subject to Section 21(e) hereof.

Further, Manufacturer's undertakings and obligations under this Section 21 shall not interfere with the Manufacturer's rights regarding information related to the Confidential Information Manufacturer demonstrates by written documentation which (i) was publicly available as of the date of this Agreement or becomes publicly available without a breach of this Agreement by Manufacturer, or (ii) was independently developed by Manufacturer without the benefit of any information relating to the Confidential Information obtained by Manufacturer from Cosmed during the Initial Period or the Extension Period.

(e) In the event that Manufacturer receives a request to disclose any information concerning the Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or by a judicial or administrative agency or legislative body or committee, Manufacturer agrees to promptly notify Cosmed of the existence, terms and circumstances surrounding such request. Manufacturer further agrees to consult with Cosmed on the advisability of taking legally available steps to resist or narrow such request. In the event that Manufacturer is compelled to disclose information concerning such Confidential Information or else stand liable for contempt or suffer other censure, Manufacturer may disclose only such portion of the information as is required by law to be disclosed.

(f) Manufacturer assigns and transfers to Cosmed, without further compensation, its entire right, title and interest, if any, in the Confidential Information and in the copyright, patent and other intellectual property rights related to the process, if any. Manufacturer hereby agrees to assist Cosmed to obtain patents on all such inventions, designs, improvements and discoveries deemed patentable by Cosmed. Manufacturer agrees that Manufacturer will execute all documents and do all things necessary to obtain letters patent, vest Cosmed with full and exclusive title thereto and protect the same against infringement by others. Upon termination of the Initial Period and/or the Extension Period or at any other time as deemed appropriate, Cosmed may, in its sole discretion, designate Manufacturer to promptly deliver to Cosmed all notes, data, reference materials, memoranda, documentation and records (and all copies or reproductions of such materials) in its possession or under its control with respect to the Confidential Information. Manufacturer acknowledges and agrees that such materials shall be, and at all times shall remain, the sole and exclusive property of Cosmed.

(g) Manufacturer agrees that, with respect to any persons, companies or corporations ("Employees") employed by Manufacturer that reasonably may be expected to or does in fact acquire information or knowledge concerning the Confidential Information, Manufacturer agrees to use its best efforts to: (i) make such Employees aware of Manufacturer's obligations set forth in this Section 21 and (ii) ensure that such Employees comply with the terms set forth in this Section 21. This paragraph (g) shall not in any manner obligate Cosmed to look first to the Employees for damages in the event of any breach of any provision or term established in this Section 21.

22. Duration. This Agreement shall be for thirty-six (36) months commencing on the date first written above (the "Initial Period") and shall automatically renew for like periods at the end of the Initial Period (the Initial Period and any additional periods are herein sometimes collectively referred to as the "Extension Period"). Either Party may terminate this Agreement by written notice to the other Party at least 120 days before the end of the Initial Period or any Extension Period. However, termination of this Agreement shall not relieve either Party of its obligation to maintain the confidentiality of all Confidential Information.

23. Termination. Notwithstanding any other provision of this Agreement and without prejudice to any other rights or remedies, either of the Parties shall have the right to terminate this Agreement by written notice to the other Party, if the Party to which the notice is sent: (i) goes into voluntary or involuntary liquidation, dissolution or bankruptcy or comes under judicial management or enters into an agreement or composition with creditors or takes or suffers any similar action in consequence of debt; or (ii) commits any serious or persistent breach of this Agreement, which breach is not cured within thirty (30) days after notice thereof by the non-breaching Party (failure to make payment of any amount by its due date shall be deemed a serious breach). Further, in the event Manufacturer defaults in the payment for processing, Cosmed shall have the right to terminate this Agreement in respect of future processing. Manufacturer may not utilize this Section 23 unless all outstanding invoices have been paid in full.

In the event Manufacturer desires to terminate this Agreement before the end of the applicable period as set forth in Section 22 hereof, and if Cosmed agrees to release Manufacturer from the Agreement, Manufacturer shall pay Cosmed within thirty (30) days of Cosmed's decision an amount equal to one half multiple times the difference between (i) the total price of the processing services that Manufacturer was obligated to purchase during the applicable period and (ii) the actual price of the processing services that Manufacturer purchased during the applicable period.

24. Notices. All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed, first class, certified mail, postage prepaid, or by overnight carrier as to each of the Parties hereto or by facsimile transmission (one business day following such transmission) at the respective address or facsimile number set forth below:

For Cosmed:

To: Clark W. Houghtling
National Director, Sales & Marketing
Cosmed Group, Inc.
21 Twicwood Lane
Queensbury, NY 12804-1330
Facsimile: 518.761.0582

For Manufacturer:

To: Robert M. Bilodeau
QA Manager
Churchill Medical Systems, Inc.
87 Venture Drive
Dover, NH 03820
Facsimile: 603.743.6328

25. Governing Law. The validity and effect of this Agreement and the rights and obligations of the Parties hereto shall be governed by, construed and enforced in accordance with the laws of the State of Rhode Island. The Parties acknowledge and agree that the terms and language of this Agreement were the result of negotiations between the Parties and, as a result, there shall be no presumption that any ambiguities shall be resolved against any Party. Any controversy over the interpretation of this Agreement shall be decided neutrally, in light of its purposes, and without regard to events of authorship or negotiation.

26. Taxes. All prices stated herein are exclusive of any applicable taxes such as sales tax. Manufacturer shall be responsible for the payment of all such taxes, or shall provide Cosmed with an appropriate certificate of exemption.

27. Survival. All indemnity, liability and limitation provisions survive the termination of this Agreement.

28. Arbitration:

(a) Any controversy, dispute or claim arising out of or relating to this Agreement, shall be resolved by arbitration in accordance with the provisions hereof and shall be in accordance with the Commercial Arbitration Rules (the "AAA Rules") of the American Arbitration Association (the "AAA"), and judgment on the award rendered by the arbitrators may be entered and specifically enforced in any court having jurisdiction thereof.

(b) Pursuant to AAA Rule 14, the Parties to such controversy, dispute or claim shall appoint an arbitrator within 5 days of a Party giving a demand for arbitration (the "Demand for Arbitration") pursuant to AAA Rule 6(a). A neutral arbitrator shall be appointed by the Party-appointed arbitrators pursuant to AAA Rule 15 within 10 days of the Demand for Arbitration. In the event any Party fails to appoint an arbitrator within the time frames set forth above, or in the event the Party-appointed arbitrators fail to appoint a third arbitrator within the time frames set forth above, AAA shall, within three business days following such failure, appoint such arbitrator(s). The sites for an arbitration pursuant to this Section shall be in Providence, Rhode Island.

(c) A final award shall be rendered as soon as reasonably possible and in any event within 180 days of filing of such Demand for Arbitration.

(d) The Parties agree that the arbitrators shall have the right to shorten the length of any notice periods or other time periods provided in the AAA Rules and to implement Expedited Procedures under the AAA Rules in order to ensure that the arbitration process is completed within the time frames provided herein. The arbitration award shall be in writing. The costs of the arbitration, including arbitrator's fees, shall be allocated among the Parties in whatever manner the arbitrators determine is appropriate.

29. Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

30. Counterparts. This Agreement may be executed in any number of counterparts and by the Parties hereto on separate counterparts and each counterpart, when so executed and delivered, shall be an original, and all such counterparts shall together constitute one and the same instrument.

31. Descriptive Headings. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

32. Consent to Jurisdiction. The Parties hereby consent to the jurisdiction of the State of Rhode Island as the place where the Arbitration provided for in this Agreement shall be held, and if Arbitration is found not to be binding upon and enforceable against the Parties, then the Parties consent to the jurisdiction of the state courts of Rhode Island and the United States District Court for the District of Rhode Island as the jurisdictions where any and all disputes arising under the Agreement will be litigated.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by the undersigned duly authorized as of the day and year first written above.

| MANUFACTURER: | COSMED GROUP, INC.: |
| --- | --- |
| Robert M. Bilodeau | David G. Howe |
| QA Manager | Vice President Operations |



CMS
00119

ATTACHMENT A

**STERILIZER SIZE:**

Thirteen (13) pallet (40" x 48" x 80").

**PRODUCTION (AND FULL CYCLE REVALIDATION) CHARGES PER RUN:**

| | | |
|---|---|---|
| $ | 1,105 | sterilization. |
| $ | N/C | placement of external biological indicators (BIs). |
| $ | N/C | retrieval of external BIs. |
| $(Option) | 20 | placement of internal BIs. |
| $(Option) | 20 | retrieval of internal BIs. |
| $ | 1,105-1,145 | Total Cost Per Run |

**SUBLETHAL AND HALF CYCLE REVALIDATION CHARGES PER RUN:**

| | | |
|---|---|---|
| $ | 1,105 | sterilization. |
| $ | 435 | temperature and relative humidity profile. |
| $ | 300 | validating minimum load temperature prior to entering preconditioning. |
| $(Option) | 70 | placement of samples. |
| $(Option) | 70 | retrieval of samples. |
| $ | 1,840-1,980 | Total Cost Per Run |

**OPTIONAL REVALIDATION SERVICES:**

| | | |
|---|---|---|
| $ | 200 | Cosmed generated revalidation protocol. |
| $ | 300 | Cosmed generated revalidation final report. |

**EXCLUSIONS:**

-BIs must be customer supplied and are not included in the pricing.

-Samples should be shipped using the customer's account number. A handling charge for using Cosmed's account number is not included in the pricing.

-Sample shipments requiring special handling, including those shipped on dry ice, will have an additional surcharge which is not included in the pricing.

-Testing will be performed at the customer designated laboratory and is not included in pricing.

**TERMS:**

A purchase order is required for all runs.

# AMERICAN ARBITRATION ASSOCIATION

In the Matter of Arbitration Between:

Re: 11 199 01280 05
Cosmed Group, Inc.
and
Churchill Medical Systems, Inc.

## NOTICE OF APPOINTMENT

To: Mr. Frederick Connelly Jr., Esq.

It is most important that the parties have complete confidence in the arbitrator's impartiality. Therefore, please disclose any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other kind. This is a continuing obligation throughout your service on the case and should any additional direct or indirect contact arise during the course of the arbitration or if there is any change at any time in the biographical information that you have provided to the AAA, it must also be disclosed. Any doubts should be resolved in favor of disclosure. If you are aware of direct or indirect contact with such individuals, please describe it below. Failure to make timely disclosures may forfeit your ability to collect compensation. The Association will call the disclosure to the attention of the parties.

You will not be able to serve until a duly executed Notice of Appointment is received and on file with the Association. Please review the attached *Disclosure Guidelines* and, after conducting a conflicts check, answer the following questions and complete the remainder of this Notice of Appointment:

| | Yes | No |
|---|---|---|
| 1. Do you or your law firm presently represent any person in a proceeding involving any party to the arbitration? | ☐ | ☑ |
| 2. Have you represented any person against any party to the arbitration? | ☐ | ☑ |
| 3. Have you had any professional or social relationship with counsel for any party in this proceeding or the firms for which they work? | ☐ | ☑ |
| 4. Have you had any professional or social relationship with any parties or witnesses identified to date in this proceeding or the entities for which they work? | ☐ | ☑ |
| 5. Have you had any professional or social relationship of which you are aware with any relative of any of the parties to this proceeding, or any relative of counsel to this proceeding, or any of the witnesses identified to date in the proceeding? | ☐ | ☑ |
| 6. Have you, any member of your family, or any close social or business associate ever served as an arbitrator in a proceeding in which any of the identified witnesses or named individual parties gave testimony? | ☐ | ☑ |
| 7. Have you, any member of your family, or any close social or business associate been involved in the last five years in a dispute involving the subject matter contained in the case, which you are assigned? | ☐ | ☑ |
| 8. Have you ever served as an expert witness or consultant to any party, attorney, witness or other arbitrator identified in this case? | ☐ | ☑ |

9. Have any of the party representatives, law firms or parties appeared before you in past arbitration cases? ☐ ☑

10. Are you a member of any organization that is not listed on your panel biography that may be relevant to this arbitration? ☐ ☑

11. Have you ever sued or been sued by either party or its representative? ☐ ☑

12. Do you or your spouse own stock in any of the companies involved in this arbitration? ☐ ☑

13. If there is more than one arbitrator appointed to this case, have you had any professional or social relationships with any of the other arbitrators? ☐ ☐ / N/A

14. Are there any connections, direct or indirect, with any of the case participants that have not been covered by the above questions? ☐ ☑

Should the answer to any question be "Yes", or if you are aware of any other information that may lead to a justifiable doubt as to your impartiality or independence or create an appearance of partiality, then describe the nature of the potential conflict(s) on an attached page.

Please indicate one of the following:

☑ I have conducted a check for conflicts and have **nothing to disclose.**

☐ I have conducted a check for conflicts and have **made disclosures on an attached sheet.**

## THE ARBITRATOR'S OATH

State of Rhode Island }
County of Providence } SS:

I attest that I have reviewed the panel biography which the American Arbitration Association provided to the parties on this case and confirm it is current, accurate and complete.

I attest that I have diligently conducted a conflicts check, including a thorough review of the information provided to me about this case to date, and that I have performed my obligations and duties to disclose in accordance with the Rules of the American Arbitration Association, Code of Ethics for Commercial Arbitrators and/or all applicable statutes pertaining to arbitrator disclosures.

I understand that my obligation to check for conflicts and make disclosures is ongoing for the length of my service as an arbitrator in this matter, and that failing to make appropriate and timely disclosures may result in my removal as arbitrator from the case and/or my removal from the AAA's Roster of Neutrals.

The Arbitrator being duly sworn, hereby accepts this appointment, and will faithfully and fairly hear and decide the matters in controversy between the parties in accordance with their arbitration agreement, the Code of Ethics, and the rules of the American Arbitration Association will make an Award according to the best of the arbitrator's understanding.

Dated: 8/15/05 Signed: [signature]

Sworn before me this 15th day of August, 2005 [signature]

JENNIFER CURRERI
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 5, 2007